**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RISHIRAM C. MAHARAJH, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-04-4184 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Rishiram C. Maharajh's ("Maharajh") and Defendant

Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"),

cross-motions for summary judgment.  Maharajh appeals the determination of an Administrative

Law Judge ("ALJ") that he is not entitled to receive Title II disability insurance benefits.  *See* 42

U.S.C. §§ 416(i), 423.  Having reviewed the pending motions, the submissions of the parties, the

pleadings, the administrative record, and the applicable law, this Court is of the opinion that

Maharajh's Motion for Summary Judgment (Docket Entry No. 14) should be denied, the

Commissioner's Motion for Summary Judgment (Docket Entry No. 18) should be granted, and the

ALJ's decision denying benefits should be affirmed.

**I.      *Background***

Maharajh filed an application for disability insurance benefits with the Social Security

Administration ("SSA") on May 29, 2002, claiming that he had been disabled and unable to work

since June 23, 1994.  (R. 15, 57-59).  Maharajh alleges that he suffers from degenerative disc

disease[1] of the lumbar spine, neck problems, and depression.  (R. 15-16, 57-59, 84).[2]  After being denied benefits initially and on reconsideration (R. 33-36, 43-47), Maharajh requested an administrative hearing before an ALJ.  (R. 31-32).

A hearing was held on November 13, 2003, in Bellaire, Texas, at which time the ALJ heard testimony from Maharajh and Byron Pettingill, a vocational expert ("VE").  (R. 15, 141-160).  In a decision dated December 5, 2003, the ALJ denied Maharajh's application for benefits.  (R. 15-22).  On December 30, 2003, Maharajh appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 10-11).  On September 3, 2004, the Appeals Council denied Maharajh's request to review the ALJ's determination.  (R. 3-5).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Maharajh filed the instant action on October 29, 2004, seeking judicial review of the Commissioner's denial of his claim for benefits.  *See* Docket Entry No. 1.

## II.   *Analysis*

### A.   *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are

---

[1] "Degenerative disease" is a disease characterized by the progressive impairment of the function of an organ or organs and not attributable to some cause such as an infection or a metabolic defect.  *See* GOULD'S MEDICAL DICTIONARY 363 (4th ed. 1979).

[2] Maharajh had previously filed an application for disability insurance benefits in February 1997.  (R. 15). After Maharajh's application was denied at the initial and reconsideration levels, he proceeded to a hearing before an ALJ, which resulted in a decision denying benefits on December 19, 1998.  (R. 15).  Maharajh appealed the decision to the Appeals Council of the SSA's Office of Hearings and Appeals, which, on May 13, 2002, denied Maharajh's request to review the ALJ's determination.  (R. 15).  There is no evidence that Maharajh sought judicial review in federal court of the denial of his 1997 application for benefits.

forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II benefits, Maharajh was insured through December 31, 2001.  (R. 21).  Consequently, to be eligible for disability benefits, Maharajh must prove that he was disabled prior to that date.

Applicants seeking benefits must prove "disability" within the meaning of the Act.  *See* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a).  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. § 423(d)(1)(A).

## B.  *Standard of Review*

### 1.  *Summary Judgment*

This Court may grant summary judgment under Fed. R. Civ. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to

grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

## 2. *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).

4

Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

**C.    *ALJ's Determination***

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 404.1520(d).

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5.    If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable

of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.

1994), *cert. denied*, 514 U.S. 1120 (1995).  If the Commissioner is able to verify that other work

exists in significant numbers in the national economy that the claimant can perform in spite of his

or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot,

in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant

is disabled or is not disabled at any point in the five-step review is conclusive and terminates the

analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony*

*v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the

Act has the burden to prove that he suffers from a disability as defined by the Act.  *See Newton*, 209

F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340,

343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed

disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209

F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see*

*also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving

significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also*

20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.  The claimant met the special earnings requirements of the Social Security Act on June 23, 1994, the date he stated he became disabled, and continued to meet them through December 31, 2001.

2.  The claimant's earnings record documents earnings at the substantial gainful activity level in 1996, but there is no evidence that he engaged in substantial gainful work since that time

3.  The claimant has degenerative changes of the spine and depression, but these impairments do not meet or equal in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's testimony was not fully credible or consistent with the record considered as a whole.

* * *

6.  The claimant does not have the residual functional capacity to perform his past relevant work.

(R. 21).  As to the fifth step, the ALJ concluded:

5.    The claimant has the residual functional capacity to perform low stress sedentary work that allows alternate sitting and standing at will as well as the use of a cane.

\* \* \*

7.    The claimant is 48 years of age, defined as a younger individual.

8.    The claimant has a high school education.

9.    The claimant does not have skills that readily transfer to jobs within his residual functional capacity.

10.    Based on the testimony of the vocational expert, and using Rule 201.21, Appendix 2, Subpart P, Regulations No. 4, as a framework for decision making, jobs that the claimant is able to perform exist in significant numbers in the national economy.  Examples of such jobs include final assembler, bench hand (such as jewelry preparer in the jewelry business), and sorter.

11.    The claimant was not under a "disability," as defined in the Social Security Act, as of and prior to December 31, 2001.

12.    The decision dated December 19, 1998, remains final and binding through its date.

(R. 21-22).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. § 405(g), 1383(c)(3).  To determine whether the decision to deny Maharajh's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational

background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

> **D.**     **_Issues Presented_**

Maharajh contends that the decision of the ALJ is not supported by substantial evidence.  Specifically, Maharajh claims that the ALJ erred by: (1) finding that he had a high school level education; (2) ruling that no psychiatric evidence existed during the relevant time frame; (3) ignoring the existence of recorded psychiatric evidence in two separate findings of a mixed personality disorder with dependent and immature features; (4) failing to consider adverse side-effects of his medication; (5) concluding Maharajh could perform sedentary work in spite of the use of a cane and an inability to stoop; and (6) erroneously identifying three "unskilled, sedentary" jobs as positions Maharajh could perform.  *See* Docket Entry No. 14.  The Commissioner disagrees with Maharajh's contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 19.

> **E.**     **_Review of the ALJ's Decision_**

>> **1.**     **_Objective Medical Evidence and Opinions of Physicians_**

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also*

20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments is equivalent or greater than a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530. For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria. *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531. A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. § 404.1526(a). The applicable regulation further provides:

(1)(i) If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A)   You do not exhibit one or more of the medical findings specified in the particular listing, or

(B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

*Id.* Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. § 404.1527(e).

A review of the medical records submitted in connection with Maharajh's administrative hearing reveals that in late May 1996, Maharajh visited Thaddeus W. Hume, M.D. ("Dr. Hume"),

complaining of low back pain. (R. 135-136).  X-rays indicated a narrowing of the L3-L4[3] disc space with osteophyte formation and some narrowing of the L5-S1[4] interspace.  (R. 136).  Dr. Hume reported that Maharajh was ambulatory in a flexed posture.  (R. 135).  Maharajh's right knee jerk reflex response was diminished with some weakness in his right dorsiflexion muscle strength.  (R. 135).  No spasm was indicated at the L3-L4 region despite some midline tenderness. (R. 135). Maharajh was diagnosed with degenerative disc disease of the lumbar spine, with a probable herniated lumbar disc.  (R. 136).  Dr. Hume opined that Maharajh might only be able to manage sedentary activities because of an inability to stand or walk to any significant degree.  (R. 136).

Also included in the record are progress notes from Heights Medical Clinic.[5]  The progress notes from September 30, 1996, and February 26, 1997, indicated that Maharajh complained of back pain and headaches lasting for 2 hours and was out of medications.[6]  (R. 116).  Maharajh received prescriptions for pain.  (R. 116).

Progress notes dated May 22, 1997, and January 8, 1998, similarly indicated Maharajh was out of medications and complained of pain in the lumbar region.  (R. 115).  Notes from January 22,

---

[3]  "L" denotes lumbar vertebrae (L1-L5).  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 2011 (29th ed. 2000).  Lumbar vertebrae are the five vertebrae between the thoracic vertebrae and the sacrum.  *See id.* at 1958.

[4]  "S" denotes sacral vertebrae (S1-S5).  *See* DORLAND'S, *supra*, at 2015.  Sacral vertebrae are the vertebrae near the sacrum, which is "the triangular shaped bone just below the lumbar vertebrae."  *Id.* at 1593.

[5]  The name of the facility later changed to Worker's Healthcare Center.

[6]  It appears that John Bergeron, M.D. ("Dr. Bergeron") was associated with Heights Medical Clinic and treated Maharajh.  (R. 97).  In many instances, however, the progress notes do not reflect the name of Maharajh's attending physician.  Nevertheless, Dr. Bergeron's name appears on various documents relating to Maharajh's prescriptions.  (R. 98, 101).

1998, and February 24, 1998, reflected no change in his back pain and indicated Maharajh reportedly had difficulty sleeping.  (R. 114).

In March 1998, Maharajh visited James Alexander Ghadially, M.D. ("Dr. Ghadially"), complaining of low back pain.  (R. 137-140).  Dr. Ghadially diagnosed Maharajh as having a herniated nucleus pulposus in the lumbar spine and recommended global fusion surgery. (R. 137-140).  At that time, Dr. Ghadially reported Maharajh had "normal mood and effect," and no history of previous depression, neurotic or psychotic disorders.  (R. 138).  Dr. Ghadially noted a loss lordosis,[7] as well as paraverbratal spasms.  (R. 138).  Dr. Ghadially further reported that there was no misalignment, asymmetry, crepitation, defects, masses or effusions, and/or dislocation in his back. (R. 138).  Dr. Ghadially observed that Maharajh had pain on palpation at L4-5 and L5-S1, centrally. (R. 138).  Maharajh's range of motion was forty degrees, ten degrees, ten degrees, and ten degrees for forward flexion, extension, lateral flexion, and rotation, respectively.  (R. 138).  Dr. Ghadially noted Maharajh was experiencing pain with extremes of range of motion.  (R. 138).  Sensory testing from L2 through S1 did not reveal asymmetry, decreased sensation, or hypersensitivity.  (R. 138).

In July 1998, Maharajh visited William R. Francis, Jr., M.D. ("Dr. Francis") at the Institute for Spinal Disorders for a second opinion.  (R. 118-119).  At that time, Maharajh had 5/5 strength in bilateral lower extremities.  (R. 118).  Maharajh's sensation was intact in bilaterally lower extremities and he had 1+ reflexes in bilateral patellar tendon achilles reflexes.  (R. 118). Dr. Francis reported that facet arthropathy[8] at levels L4-5 and L5-S1 existed in earlier x-rays of Maharajh's

---

[7]  "Lordosis" is the anterior concavity in the curvature fo the lumbar and cervical spine as viewed from the side.  DORLAND'S, *supra*, at 1027.

[8]  "Facet" refers to a small plane surface, especially on a bone or a hard body.  *See* GOULD'S, *supra*, at 486. "Arthropathy" refers any joint disease.  *See* DORLAND'S, *supra*, at 153.

spine. (R. 118).  Dr. Francis noted that he did not have the CT-myelogram and discogram films and, therefore, could not render an opinion whether surgery should be performed.  (R. 119).

Progress notes from April 23, 1998, indicated Maharajh felt pain relief from some of his medication, but no relief from other medication.  (R. 113).  The progress notes on August 21, 1998, and September 29, 1998, indicated no improvement and no change in Maharajh's lower back.  (R. 112).  On November 18, 1998, Maharajh reported that the right side of his body felt numb and he "can't sleep too well."  (R. 111).  Maharajh further complained of constipation and rectal bleeding. (R. 111).

On January 20, 1999, Dr. Francis reexamined Maharajh.  (R. 117).  Dr. Francis observed changes in disc hydration throughout the lumbar area, worse at L5-S1 and L4-5.  (R. 117). Dr. Francis reported marked S1 sciatica[9] on the right side, back pain, and hip pain, as well as marked sciatica on straight leg raising. (R. 117).  Dr. Francis recommended Maharajh to undergo a new MRI and discogram-CT.  (R. 117).  Dr. Francis' assessment was that Maharajh probably had "compromised degenerative disc disease."  (R. 117).  In the progress notes dated January 21, 1999, Maharajh indicated experiencing bad pain and was prescribed medication.  (R. 110).

On February 17, 1999, Maharajh visited his chiropractor, Tony Sappington, D.C. ("Sappington"), complaining of low back pain, stiffness, and a "needle like sensation" in his lumbar spine and right leg.  (R. 126).  Sappington's examination of Maharajh revealed positive straight leg raise on the left of approximately thirty-five decrees and possible hamstring pain.  (R. 126). Sappington noted that Maharajh's deep tendon reflexes appeared to be intact and that "bulk strength

---

[9] "Sciatica" is a syndrome characterized by pain radiation from the back into the buttock and into the lower extremity along its posterior or lateral aspect, and most commonly caused by protrusion of a low lumbar intervertebral disk. DORLAND'S, *supra*, at 1609.

appears to be intact at 5/5." (R. 126). Sappington concurred with Dr. Francis that Maharajh should undergo new MRI and CT scans as soon as possible. (R. 126). In progress notes dated February 18, 1999, Maharajh complained that his right leg would "give out." (R. 109). Maharajh received additional prescriptions for pain. (R. 109).

On March 2, 1999, Maharajh visited M. Samer Ghafir, M.D. ("Dr. Ghafir") at Rydic Open MRI of America. (R. 108). Dr. Ghafir reviewed Maharajh's MRI of his lumbar spine finding slight degenerative changes at the L3-L4 and L5-S1 discs, with mild degeneration of facets at L5-S1 and L4-L5 and, to a lesser degree, at L3-L4. (R. 108). Dr. Ghafir also noted mild borderline spinal stenosis[10] at L3-L4. (R. 108). In progress notes dated March 18, 1999, Maharajh rated his pain an 8 out of 10 and stated there were "ups and downs" regarding his complaints of low back pain. (R. 107). Maharajh further indicated that the therapy with his chiropractor, Sappington, three times a week was helping to control his pain. (R. 107). Pain medications were prescribed. (R. 107). On April 26, 1999, Maharajh reported pain in his lower back and in his right foot. (R. 106). The progress notes reflected that he had been out of medications for one week. (R. 106). Also, Maharajh stated that the pain medication helped considerably. (R. 106).

Progress notes dated July 12, 1999, indicated Maharajh complained of back pain and pain in his right foot. (R. 106). Maharajh had been out of medications for two weeks. (R. 106). Progress notes dated October 25, 1999, reflected the same complaints of back pain, and Maharajh was prescribed pain medications. (R. 105). Progress notes dated November 22, 1999, indicated that Maharajh continued to experience back pain and additional medications were prescribed. (R. 104).

---

[10]  "Spinal stenosis" is the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space. *See* DORLAND'S, *supra*, at 1698.

On February 1, 2000, Maharajh reported that he was "not doing too good" and had been experiencing increased pain for two weeks.  (R. 103).  Progress notes dated April 27, 2000, May 1, 2000, and October 12, 2000, indicated pain medication was prescribed to Maharajh.  (R. 102-103).  On October 12, 2000, Dr. Bergeron wrote a letter of medical necessity for certain pain medications for Maharajh, including Darvocet-N100, Ultram, Flexeril, and Celebrex.  (R. 125).  A historical statement, relating to Maharajh's ailments, noted "bilateral paraspinal muscle tenderness was noted in the lumbar region and lumbar flexion of only 30 degrees illicited pain. DTRs in the lower extremities were +1 and symmetrical."  (R. 101).  Dr. Bergeron listed lumbar radiculopathy[11] as Maharajh's original diagnosis.  (R. 101).

Progress notes from the Workers' Healthcare Center on January 17, 2001, indicated pain prescription refills for Maharajh.  (R. 100).  In December 2001, Sappington dictated a letter to an unknown recipient indicating the surgical outcome for Maharajh's pain was sub-optimal.  (R. 125).

On January 25, 2002, Maharajh complained of lower back pain and leg pain.  (R. 99).  Maharajh reported difficulty getting out of bed and difficulty walking.  (R. 99).  Pain medications were refilled.  (R. 99).  On January 25, 2002, Dr. Bergeron wrote another letter of medical necessity to continue Maharajh on the pain medication Darvocet, asserting that Maharajh suffers from lumbar radiculopathy.  (R. 98).

In July 2002, Bonnie Blacklock, M.D. ("Dr. Blacklock") performed an assessment for the SSA, resulting in a technical denial of Maharajh's request.  (R. 127).  Dr. Blacklock described the medical records before the date last insured of December 31, 2001, as not descriptive enough to make a decision, especially regarding function and ability to work.  (R. 127).

---

[11]  "Radiculopathy" refers to a disease of the nerve roots.  *See* DORLAND'S, *supra*, at 1511.

In June 2003, Maharajh went to the emergency room at East Houston Regional Medical Center, complaining of lower back pain and muscle spasms.  (R. 132).  Maharajh received an examination and evaluation, an x-ray, and prescribed medication.  (R. 132).

In October 2003, Maharajh underwent a full psychiatric evaluation by James Ganc, M.D. ("Dr. Ganc").  (R. 128-131).  Dr. Ganc noted that "[Maharajh] says that lately he has become more and more depressed." (R. 129).  On the Beck Depressive Inventory Scale, Maharajh received a score of 26, indicating a mild level of depression. (R. 130).  Dr. Ganc's diagnostic impression was that Maharajh had a mild, major depressive disorder, as well as a mixed personality disorder with dependent and immature features.  (R. 131).  Dr. Ganc assigned Maharajh a Global Assessment of Functioning ("GAF") score of 45.[12]  (R. 131).  Dr. Ganc's prognosis of Maharajh was guarded. (R. 131).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S.

---

[12]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms.  A GAF rating of 50 indicates a "serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job); where, a GAF rating of 45 indicates increased severity of the impairment in social, occupational, or school functioning. *See id.* at 34.

103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456 (citing *Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211).  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Maharajh suffered from impairments which did not meet or equal the requirements of a listing.[13]  Nevertheless, Maharajh asserts that the ALJ committed error by ignoring his combined psychiatric disorders of depression and a personality disorder, contending that these disorders satisfy the requirements of Section

---

[13]  While the ALJ acknowledged slight degenerative changes at the L3-4 and L5-S1 discs and "mild borderline" spinal stenosis at the L3-4 level (R. 16), the record does not indicate an accompanying compromise of a nerve root nor the equivalent severity of combined disabilities.  Maharajh does not contest the ALJ's findings that Maharajh's back pain does not equal the severity requirements of Section 1.04. *See* Docket Entry No. 14, at 12.  Instead, Maharajh argues that he suffers from a severe personality disorder, which combined with the nonconforming back problems and severe depression, should equate to a listing.  *See id.* at 5-12.

12.08.[14]  *See* Docket Entry No. 14, at 12.  Maharajh relies on two psychiatric evaluations, a 2003

evaluation (R. 128-131) and a 1999 evaluation, which was not part of the underlying administrative

record.  *See* Docket Entry No. 14, at Exhibit A.  Contrary to Maharajh's contention, the medical

records in the relative time frame do not indicate Maharajh suffered from multiple psychiatric

disorders.

### a.      *1999 Psychological Examination*

Attached as an exhibit to Maharajh's motion for summary judgment, he submits a 1999

psychological examination.  *See* Docket Entry No. 14, at Exhibit A.  This report, however, is not part

of the underlying administrative record; hence, the Court must determine if it should consider the

1999 psychological report as additional evidence.[15]  A district court may order additional evidence

to be heard ". . . only upon a showing that there is new evidence which is material and that there is

good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42

U.S.C. § 405(g); *see also Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

Because the 1999 evaluation is not "new evidence" it will not be admitted as additional

evidence in this case.  *See Falco*, 27 F.3d at 164.  The psychiatric evaluation took place more than

four years prior to the underlying administrative hearing and, as Maharajh acknowledged, was

evidence in his prior, 1997, administrative hearing.  *See* Docket Entry No. 14, at 8.

Furthermore, Maharajh fails to show that the 1999 psychiatric evaluation, if developed

adequately by the ALJ, would have changed the end result; thus, there has been no showing of

---

[14]  Listing 12.08 addresses personality disorders.  *See* 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.08.

[15]  There is no evidence demonstrating that the 1999 psychological evaluation was presented to either the ALJ or the Appeals Council.

19

materiality.  *See Brock v. Chater,* 84 F.3d 726, 728-29 (5th Cir. 1996); *see also Glover v. Barnhart*, 81 Fed. Appx. 513, 515 (5th Cir. 2003); *Castillo v. Barnhart*, 325 F.3d 550, 552 (5th Cir. 2003). Instead, Maharajh acknowledged that the limitations and diagnosis present in the 2003 evaluation, which is part of the underlying administrative hearing, "had remained essentially unchanged" as to the 1999 evaluation.  *See* Docket Entry No. 14, at 10.

Also, Maharajh does not demonstrate good cause as to why the 1999 psychological evaluation was not presented to the ALJ and/or the Appeals Council and made part of the administrative record; instead, he attempts to shift the blame to the ALJ.  *See* Docket Entry No. 14, at 5-8.  Maharajh's bleated contention that the ALJ should have referred to records submitted in a separate claim for benefits made five years prior, after Maharajh failed to include the report in the current proceeding, does not rise to the level of "good cause."  *See Falco*, 27 F.3d at 164.

Because the 1999 evaluation has not been shown to be either new or material, and Maharajh has failed to demonstrate good cause as to why the evaluation was not included in the underlying administrative hearing, it will not be considered as additional evidence in this case.

**b.**   *2003 Psychological Examination*

Maharajh further argues that the ALJ erred by finding that Dr. Ganc's 2003 evaluation was unreliable because it failed to reconcile certain inconsistencies, namely, a GAF score of 45 combined with a diagnosis of "mild" depressive disorder. (R. at 128-131).  Contrary to Maharajh's contention, the record supports the ALJ's determination that the 2003 psychological evaluation was inconsistent, as the progress notes from the Workers' Healthcare Clinic and other treating physicians' diagnoses were silent with respect to severe depression and/or a severe personality disorder. (R. 17).  The record is void of any other reports by Maharajh complaining of a severe personality disorder.

20

Similarly, it does not appear that Maharajh was prescribed psychotropic medication to treat his alleged personality disorder.  Indeed, in March 1998, Dr. Ghadially reported that Maharajh "manifests normal mood and affect." (R. 139).  Dr. Ghadially also noted that there was "[n]o history of previous depression, neurotic or psychotic disorders." (R. 138).

Moreover, in his disability report to the SSA, Maharajh failed to list his alleged personality disorder as part of his disability claim.  (R. 84).  Maharajh made reference only to his back and neck pain.  (R. 84).  Additionally, at the administrative hearing, neither Maharajh nor his attorney raised the issue of a severe personality disorder.  (R. 143-159).  Instead, Maharajh's counsel presented a series of questions about Maharajh's lack of a social network and lack of hobbies and interests as diminishing Maharajh's enjoyment of life.  (R. 152-155).  The ALJ acknowledged that Maharajh's complaints of depression were documented in the medical record, but not to the level of an affective disorder and/or severe personality disorder.  (R. 16).  As discussed above, the burden to prove that the claimant meets a listing is on Maharajh at the third step of the sequential evaluation process.  The lack of evidence of an affective disorder and/or severe personality disorder supports the ALJ's conclusion that the 2003 evaluation was unreliable and that Maharajh's depression was not disabling to the degree Maharajh asserted.

Finally, Dr. Ganc's 2003 psychiatric evaluation cannot be considered material evidence as to whether Maharajh suffers from a mental disability during the time frame Maharajh was insured (*i.e.*, December 31, 2001).  (R. 17).  *See Falco*, 27 F.3d at 164.  Because Dr. Ganc's evaluation was completed nearly two years *after* Maharajh's disability insurance had expired and the absence in the record of a previous determination of a mental disorder, the ALJ properly determined the 2003 report did not establish depression and/or a personality disorder during the time Maharajh was insured.  (R.

17).  For the these reasons, the ALJ's determination that Maharajh does not have a severe mental impairment is supported by substantial evidence.

### 2.   *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, he must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 & n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

Here, the medical records and Maharajh's testimony at the administrative hearing set forth his complaints of lower back pain and numbness in his extremities.  (R. 144-156).  As a matter of

22

law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986). However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Maharajh testified regarding his complaints of pain. (R. 144-156). The ALJ's decision reveals that the ALJ did consider objective and subjective factors related to the severity of Maharajh's pain:

> In reaching a conclusion regarding the claimant's residual functional capacity, his subjective complaints and testimony were taken into consideration and evaluated in accordance with section 404.1529 of Social Security Regulation No. 4 (20 C.F.R. § 404.1529) which incorporates Social Security Rulings 88-13 (Cumulative Edition, 1988) and 90-1p (Cumulative Edition, 1990-1991), restated and clarified in Social Security Ruling 96-7p.

* * *

> The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein; and the claimant's subjective complaints are found not to be fully credible but somewhat exaggerated.

(R. 19-20). Moreover, the ALJ's findings are supported by the medical record. The ALJ considered progress notes reporting that Maharajh was out of medication on numerous occasions, Maharajh's statement that he did not take any nonprescription drugs to treat pain, and lack of weight loss during the insured status as specific indicators that Maharajh's complaints were exaggerated. (R. 19, 106, 110, 115-116). Indeed, the record is void of evidence of muscular atrophy or fasciculation. Dr. Hume noted in May 1996, some weakness in Maharajh's right dorsiflexion muscle strength and a diminished right knee jerk reflex response. (R. 135). As noted by Dr. Ghadially in March 1998, there was no significant neurological deficits, specifically, no radiculopathy, numbness or tingling, weakness, abnormalities of gait, proprioception, memory loss, or confusion. (R. 138). Maharajh had normal muscular strength in all muscle groups and generally unimpeded range of motion. (R. 138-139).

To the extent Maharajh complains of a disabling mental disorder (as set forth above), Dr. Ghadially noted that Maharajh had "normal mood and effect," which undermines Maharajh's assertion that he suffered from a severe mental disorder during his insured status. (R. 138). Furthermore, the issue of a severe mental disorder was not raised during the administrative hearing by Maharajh or his counsel. (R. 143-156). Thus, the record lacks reliable evidence supporting a mental disorder.

Based on Maharajh's description of an average day in his disability report to the SSA dated July 12, 2002, the ALJ considered Maharajh's allegation that he spent the entire day lying down as

self serving. (R. 20, 69). In contrast, in July 1998, Maharajh reported on a health questionnaire for Dr. Francis that he sometimes exercises regularly. (R. 123). Also, in July 1998, Dr. Francis reported that Maharajh had normal muscle strength and intact sensation in the bilateral lower extremities. (R. 118). By March 1999, Maharajh indicated that treatments with his chiropractor were helping to control the pain. (R. 107). In 2003, Dr. Ganc noted in his psychiatric evaluation that Maharajh's daily activities included watching television, playing with his grandchildren, and the ability to handle his own personal affairs. (R. 130). Also, Maharajh testified at the underlying administrative hearing that he "was trying to do a little exercise" when he allegedly re-injured his back. (R. 147). These contradictions further undermine Maharajh's credibility; thus, the ALJ properly discounted Maharajh's testimony. (R. 19-20).

Maharajh further contends that the ALJ erred by failing to consider the side effects from his pain medication; Maharajh argues that his pain medication Flexeril makes him drowsy and would limit him in a competitive work setting. *See* Docket Entry No. 14. Maharajh, however, did not lodge a medication side effects complaint at the underlying administrative hearing. (R. 141-159). Furthermore, there is no evidence in the record that Maharajh complained about drowsy side effects of his medication to his treating physicians. *See Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994). Maharajh's belated, conclusory allegation, without more, is insufficient to establish that medication side effects constituted a significant work-related limitation. *See Wren*, 925 F.2d at 125; *Houston*, 895 F.2d at 1016 (subjective complaints must be corroborated at least in part by objective medical evidence).

The Court does not doubt that Maharajh suffers from pain; however, the records do not support a finding that Maharajh's pain is constant, unremitting, and wholly unresponsive to

therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at

128.  Accordingly, there is substantial evidence that supports the ALJ's finding that Maharajh's

subjective reports of pain do not rise to the level of disability.

**3.**    ***Residual Functional Capacity***

Under the Act, a person is considered disabled:

> . . . only if his physical or mental impairment or impairments are of such severity that
> he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a

claimant's functional capacity, age, education, and work experience allow him to perform work in

the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309

F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the

Commissioner fulfills this burden by pointing out potential alternative employment, the claimant,

in order to prevail, must prove that he cannot perform the alternate work suggested.  *See Masterson*,

309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135

(5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual

functional capacity" must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990);

*see also* 20 C.F.R. § 404.1545.  This term of art merely represents an individual's ability to perform

activities despite the limitations imposed by an impairment.  *See Villa v. Sullivan*, 895 F.2d 1019,

1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  Residual functional capacity combines a

medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.   When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620.  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id*.  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id*.  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . .  RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing

basis. . . .  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  To determine that a claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

### a.  *Education Level*

In the case at bar, Maharajh contends that the ALJ erred by concluding that Maharajh had a high school education.  *See* Docket Entry No. 14, at 3-5.  Although Maharajh claims to have only completed through elementary school in the 2003 psychiatric examination and in his testimony before the ALJ (R. 129, 144), Maharajh attested in two Social Security disability reports that he had completed through the twelfth grade.  (R. 71, 90).  Maharajh signed the disability reports, acknowledging that the information contained in the reports was true.  (R. 78, 92).  In the case at bar,

the ALJ's reliance on Maharajh's signed statements does not rise to the level of reversible error. Although the ALJ did not acknowledge the conflict, education is only one of several factors the court must weigh to determine Maharajh's disability status during the insured period. *See Perez v. Barnhart*, 415 F.3d 457, 463 (5th Cir. 2005). Even if the ALJ found Maharajh to possess a marginal or limited education, Maharajh does not allege that he would have been deemed disabled but for the conflict in evidence. *See id.* Likewise, Maharajh does not demonstrate how the discrepancy between a high school and an elementary level education would prevent him from performing the low skilled, sedentary jobs identified by the vocational expert. *See id.*

Furthermore, Maharajh failed to provide any evidence substantiating his assertion regarding his level of education. (R.128, 144). Maharajh does not offer any explanation as to why he attested twice to the SSA he completed through the twelfth grade. Moreover, Maharajh's special job training (R. 90) and his 13-year work history as a skilled mechanic (R. 71-72, 85, 93) are highly inconsistent with Maharajh's claims of a marginal or minimal education.

Contrary to Maharajh's assertion that he is "barely literate" (Docket Entry No. 14, at 4), substantial evidence supports the ALJ's decision that he is capable of performing low-stress, sedentary work. During the testimony in the underlying administrative hearing (R. 141-160), neither Maharajh nor his counsel asserted Maharajh's inadequate reading level would prevent him from performing low-stress, sedentary work. Also, Maharajh indicated in the Social Security Disability Report dated May 29, 2002, that he can read, speak, and write more than his name in English. (R. 83). Furthermore, Maharajh responded to the question in the same disability report that he had completed special job training, trade or vocational school in 1977 by indicating "Mechanic- Engines

29

& Trans." (R. 90).  In sum, Maharajh's claim of a fifth grade level of education is unsupported by objective evidence.

        **b.**    ***Vocational Expert's Testimony***

In the case at bar, the VE testified that Maharajh is no longer capable of performing past relevant work as an automobile mechanic, because this type of work is customarily performed at the medium exertional level and Maharajh's ability is restricted to the low-stress, unskilled positions. (R. 157-158).  Based on Maharajh's age, education, work experience, and RFC, the VE testified that Maharajh would be able to perform unskilled, sedentary work that existed in significant numbers in the national economy, including a final assembler, a bench hand, and a sorter.  (R. 158).  In response to questions by Maharajh's counsel, the VE testified that the above mentioned jobs would require competitiveness and up to six hours of sitting.  (R. 158-159).  The VE agreed that an individual who would miss one day out of eight working days could not maintain a competitive job.  (R. 159).  The record, however, does not reflect any objective or subjective evidence that Maharajh qualifies as an individual who would be absent one of every eight working days, as set forth in the hypothetical by Maharajh's counsel.

Maharajh argues that he cannot perform the sedentary jobs with the required use of a cane and an inability to stoop.  *See* Docket Entry No. 14.  The record, however, is void of any evidence that a treating physician prescribed Maharajh an ambulatory device.  Moreover, the ALJ acknowledged Maharajh's use of a cane while discussing the hypothetical with the VE, as well as in the decision to deny benefits. (R. 20, 157).  Maharajh further argues that an inability to stoop, precludes him from performing a full-time sedentary job in a competitive work setting.  *See* Docket Entry No. 14, at 14.  Maharajh, however, fails to cite to any objective medical evidence

in the record demonstrating that he cannot stoop.  Moreover, Maharajh's counsel was provided an opportunity at the administrative hearing to cross-examine the VE regarding additional limitations, including an alleged inability to stoop.  *See Boyd*, 239 F.3d at 707; *see also Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994) (when a hypothetical question reasonably incorporates all of the "disabilities" found by the ALJ, and claimant's representative was provided an opportunity to "correct any defect" about additional limitations, the hypothetical question is sufficient).  Hence, the ALJ's decision at step five of the sequential evaluation process was proper.

Maharajh next asserts that the three unskilled, sedentary jobs, identified by the VE, do not exist in the national economy in significant numbers.  In Social Security proceedings, the Commissioner routinely takes administrative notice of job information contained in the Dictionary of Occupational Titles ("DOT") when determining whether work exists in significant numbers in the national economy.  *See Sykes*, 228 F.3d at 269; *Gibson v. Heckler*, 762 F.2d 1516, 1518 n.2 (11th Cir.1985); *see* 20 C.F.R. § 404.1566(d)(1); SSR 00-4p (S.S.A. Dec. 4, 2000).

Specifically, Maharajh claims that the final assembler and bench-hand positions do not exist in significant numbers in the national economy.  *See* Docket Entry No. 14, at 15-16; *see also* Dictionary of Occupational Titles, §§ 700.687-026, 713.687-018 (4th ed. 1991).  Maharajh asserts that because the DOT job definitions have not been updated since 1977, these jobs "may exist in China, Taiwan and other countries," but not in the United States.  *See* Docket Entry No. 14, at 15. Besides attaching an article from a Social Security Disability Law Conference as an exhibit, Maharajh does not offer any evidence suggesting that the DOT is unreliable.  *See* Docket Entry No. 14, at Exhibit F.  Thus, Maharajh has failed to demonstrate a conflict between the VE's testimony and the DOT.

Finally, Maharajh argues that the DOT does not contain any unskilled, sedentary "sorter" positions.  *See* Docket Entry No. 14, at 18; *see also Dictionary of Occupational Titles*, § 753.587-010 (4th ed. 1991).  By way of example, the VE referenced the shoe industry in response to the ALJ's hypothetical:  "[a]nd a sorter, your Honor, a sorter, for example, in the shoe industry, and there are about 500 positions in the aggregate in the region and about 50,000 nationally." (R. 158).  Although Maharajh correctly asserts that a sorter in the shoe industry requires *light* strength, the VE identified the shoe industry as an illustration of a sorter position, not as a limitation to a specific sorter position that Maharajh could fulfill.  Contrary to Maharajh's assertion that there are no sorter positions in the American economy at the sedentary level, there are at least two sorter positions in the DOT which are classified as sedentary:  sorter (jeweler-silver) and sorter (clerical). *See* Dictionary of Occupational Titles, §§ 209.687-022, 735.687-030 (4th ed. 1991).  Thus, there are no direct or implied conflicts between the VE and the DOT.  In sum, the presence in the DOT of the final assembler position, the bench-hand position, and the sedentary, unskilled sorter positions, which were properly identified by the VE, sufficiently demonstrate that jobs exist in the national and regional economy in significant numbers.

Beyond questioning the VE about competitiveness and sit/stand opportunities, Maharajh's counsel did not ask additional questions or offer evidence that Maharajh was unable to perform the sedentary work detailed by the VE.  (R. 158-159).  The Fifth Circuit has held that "where the claimant offers no evidence contrary to the VE's testimony, the claimant fails to meet his burden of proof under the fifth step of the disability analysis." *Perez*, 415 F.3d at 464.  Accordingly, Maharajh did not prove that he cannot perform the alternate work suggested by the VE.  Substantial evidence

supports the ALJ's findings that Maharajh is capable of performing sedentary work. *See Watson*, 288 F.3d at 215.

As such, taken as a whole, there is sufficient evidence in the record to support the ALJ's conclusion that Maharajh was capable of performing a significant number of sedentary jobs available in the national and regional economies. *See Carey*, 230 F.3d at 147. In short, the bulk of the evidence before the ALJ, when proper legal standards are applied, reflects that Maharajh was capable of engaging in substantial gainful activity, precluding a finding of disability within the parameters of the Act. *See Masterson*, 309 F.3d at 273; *Brown*, 182 F.3d at 496-98; *Greenspan*, 38 F.3d at 236; *Falco*, 27 F.3d at 162-64; *Wren*, 925 F.2d at 128; *Selders*, 914 F. 2d at 618-20.

III.    *Conclusion*

In sum, the record provides substantial evidence supporting the Commissioner's decision that Maharajh is not disabled. It is, therefore

**ORDERED** that Maharajh's Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**. It is further

**ORDERED** that Commissioner's Motion for Summary Judgment (Docket Entry No. 18) is **GRANTED**. It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**. Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas, on this the 5th day of January, 2006.

Calvin Botley
United States Magistrate Judge